**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION**

WILLIE MACON,

Plaintiff,

vs. CASE NO.:

4J VAN LLC
Florida Limited Liability Company
d/b/a TSUKIYOMI SUSHI BAR
AND GRILL

INJUNCTIVE RELIEF SOUGHT

Defendant(s).

# COMPLAINT

Plaintiff, WILLIE MACON (hereinafter "MACON"), by and through the undersigned counsel, hereby files this Complaint and sues 4J VAN LLC, Florida Limited Liability Company, d/b/a TSUKIYOMI SUSHI BAR AND GRILL ("Defendant"), for declaratory and injunctive relief pursuant to 28 U.S.C. §§2201 and 2202, attorneys' fees, litigation expenses, costs (including, but not limited to, court costs and expert fees) for unlawful disability discrimination pursuant Title III of the Americans with Disabilities Act of 1990, as amended, 42 U.S.C. §§ 12181-12189 ("ADA"), and the regulations implementing the ADA set for in 28 C.F.R. Part 36, et seq, and alleges as follows:

1. This action arises from Defendant's failure to make Defendant's online platform located at www.tsukiyomisushi.com (hereinafter "Defendant's Website") compatible with screen access software, thereby denying blind individuals, including MACON, full and equal access to Defendant's products and services.

2. MACON files this lawsuit because Defendant's policies exclude him, and millions of other potential consumers, from fully and equally enjoying Defendant's products and services.

3. Accordingly, MACON seeks an order requiring that Defendant make Defendant's Website accessible and adopt sufficient policies and practices to ensure the Defendant's Website does not become inaccessible again in the future.

## JURISDICTION AND VENUE

4. This Court is vested with original jurisdiction over this action pursuant to 28 U.S.C. § 1331 and to 28 U.S.C. §1343 for Plaintiff's claims arising under Title 42 U.S.C. §§ 12181-12189, based on Defendant's violations of Title III of the ADA. See also 28 U.S.C. §§ 2201, 2202, as well as the 2010 ADA Standards.

5. Venue is proper in this Court, Tampa Division, pursuant to 28 U.S.C. § 1391(B) and Internal Operating Procedures for the United States District Court of

the Middle District of Florida in that a substantial part of the acts and omissions giving rise to MACON's claims occurred in Polk County, Florida.

6. Defendant attempts to and indeed does, participate in Polk County's economic life by offering and providing products and services over the internet to Polk County's residents, but also extends its services to other residents within the state of Florida through its online presence, including MACON, who is a resident of Orange County, Florida. Defendant purposefully avails itself of the benefits and advantages of operating an interactive, online business open 24-hours a day, 7-days a week, 365-days a year to Florida residents. Indeed, upon information and belief, Defendant places cookies on computers and other electronic devices physically located throughout Florida every time a Florida resident visits Defendant's Website.

7. Further, Defendant operates a Principal Place of Business with a physical address of 317 W Central Ave, Winter Haven, FL 33880 (hereinafter "Defendant's Principal Place of Business"), which is located in Polk County, Florida.

8. MACON was injured when he attempted to access Defendant's Website and encountered communication barriers that denied him full and equal access to Defendant's online products, content, services, and other information that Defendant is interested in communicating/offering to its customers.

**PARTIES**

9. MACON is a natural person over the age of 18 and is blind.

10. MACON is *sui juris* and is a resident of the State of Florida residing in Orlando, Florida, located in Orange County.

11. MACON is disabled as defined by the ADA and is therefore a member of a protected class under Title III of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12102(2), and the regulations implementing the ADA set forth at 28 CFR §§ 36.101 et seq. More specifically, MACON is legally blind from Traction Retinal Detachment, Neovascular Glaucoma, and other ocular complications caused by Diabetes Type I, and therefore is substantially limited in performing one or more major life activities, including but not limited to accurately visualizing his world. As a result of his visual impairment, MACON uses screen access software to access digital content, like text messages, emails, and websites.

12. MACON cannot use his computer without the assistance of appropriate and available auxiliary aids, screen reader software, and other technology and assistance. Screen reader software translates the visual internet into an auditory equivalent. At a rapid pace, the software reads the content of a webpage to the user. As explained in the Eastern District of New York holding of *Andrews v. Blick Art Materials, LLC*:

> The screen reading software uses auditory cues to allow a visually impaired user to effectively use websites. For example, when using

> the visual internet, a seeing user learns that a link may be 'clicked,' which will bring him to another webpage, through visual cues, such as a change in the color of the text (often text is turned from black to blue). When the sighted user's cursor hovers over the link, it changes from an arrow symbol to a hand. The screen reading software uses auditory -- rather than visual -- cues to relay this same information. When a sight impaired individual reaches a link that may be 'clicked on,' the software reads the link to the user, and after reading the text of the link says the word 'clickable.'...Through a series of auditory cues read aloud by the screen reader, the visually impaired user can navigate a website by listening and responding with his keyboard.

*Andrews v. Blick Art Materials, LLC*, 286 F.Supp.3d 365, 374 (E.D.N.Y.2017).

13. MACON's blindness limits him in the performance of major life activities, including sight, and he requires assistive technologies, auxiliary aids, and services for effective communication, including communication in connection with his use of a computer.

14. MACON frequently accesses the internet. Due to blindness, to effectively communicate and comprehend information available on the internet and thereby access and comprehend websites, MACON uses commercially available screen reader software to interface with the various websites.

15. Defendant is a Florida Limited Liability Company with a principal place of business of 317 W Central Ave, Winter Haven, FL 33880 (hereinafter "Defendant's Principal Place of Business").

16. Defendant operates a sushi restaurant under the name Tsukiyomi Sushi Bar & Grill at Defendant's Principal Place of Business. Defendant provides

sushi and other food and beverage products to the public. Defendant operates Defendant's Website, through which consumers can review Defendant's menu and prices, obtain operating hours, select food for purchase, and access information regarding other goods and services available at Defendant's physical location.

17. Defendant owns, operates, maintains, and/or controls Defendant’s Website and is responsible for the policies, practices, and procedures concerning Defendant’s Website development and maintenance.

18. Defendant’s Principal Place of Business is also open to the public. As such, it is a Place of Public Accommodation subject to the requirements of Title III of the ADA and its implementing regulations as defined by 42 U.S.C. §12181(7)(B), §12182, and 28 C.F.R. §36.104(2). Defendant’s Principal Place of Business is also referenced as a “place of public accommodation.”

19. Defendant operates its restaurant business from its Principal Place of Business and maintains Defendant's Website as a digital extension of that physical establishment. Defendant's Website is owned, controlled, and operated by Defendant in direct connection with its Principal Place of Business. Through Defendant's Website, consumers can review Defendant's menu and prices, obtain operating hours, and select food for purchase to order via phone. Because Defendant's Website serves as a gateway through which consumers may access and transact with Defendant's brick-and-mortar restaurant, a sufficient nexus exists

between Defendant's Website and Defendant's physical place of public accommodation.

20. At all times material hereto, Defendant was and still is an organization owning, operating, and/or controlling Defendant's Website. Since Defendant's Website is open to the public through the internet, by this nexus Defendant's Website is an intangible service, privilege, and advantage of Defendant's Principal Place of Business that must comply with all requirements of the ADA, must not discriminate against individuals with visual disabilities, and must not deny those individuals the same full and equal access to and enjoyment of the goods, services, privileges, and advantages as are afforded the non-visually disabled public both online and in the Principal Place of Business. As such, Defendant has subjected itself and Defendant's Website to the requirements of the ADA.

## FACTUAL AND SUBSTANTIVE ALLEGATIONS

21. MACON is and has been a customer who is interested in patronizing and intends to patronize in the near future, once Defendant's Website's access barriers are removed or remedied, Defendant's Principal Place of Business.

22. During MACON's Website Visits, MACON attempted to use Defendant's Website to review Defendant's menu and prices, obtain operating hours, and select food for purchase from Defendant's Principal Place of Business, the same functions available to non-disabled customers. Defendant's menu was

presented as an image of text that MACON could not access with his screen reader software, preventing him from independently reviewing the menu and completing these functions. Defendant's failure to make these functions accessible to MACON's screen reader software denied MACON the same access to Defendant's goods that Defendant's Website provides to non-disabled customers.

23. Defendant’s Website is additionally used to search for brick-and-mortar locations, check Defendant’s hours, pricing, offerings, and sign up for electronic mailers to receive offers, benefits, exclusive invitations, and discounts for use at Defendant’s Website or in Defendant’s Principal Place of Business.

24. The opportunity to shop and pre-shop Defendant’s offerings available for purchase at Defendant’s Principal Place of Business and sign up for electronic mailers to receive offers, benefits, exclusive invitations, and discounts for use at Defendant’s Principal Place of Business from his home are important accommodations for MACON because traveling outside of his home as a visually disabled individual is often a difficult, hazardous, frightening, frustrating and confusing experience. These online functions directly affect MACON’s in-store experience, such that they are tied to and provide a benefit to MACON. Defendant has not provided its business information in any other digital format that is

accessible for use by blind and visually impaired individuals using the screen reader software.

25. Like many consumers, MACON accesses numerous websites at a time to compare offerings, prices, sales, discounts, events, and promotions. MACON may view several dozen websites to compare features, discounts, promotions, and prices.

26. MACON utilizes screen reader software that allows individuals who are visually disabled to communicate with websites. However, Defendant's Website contains access barriers that prevent free and full use by visually disabled individuals using keyboards and available screen reader software.

27. On or about the following dates, MACON attempted to utilize Defendant's Website:

a. June 22, 2026;

b. July 10, 2026;

c. July 29, 2026;

d. August 13, 2026;

e. August 31, 2026; and

f. September 15, 2026.

(hereinafter "MACON's Website Visits"). During MACON's Website Visits, MACON experienced substantial access barriers and, thus, was denied fair and

equal access to same. MACON was attempting to browse the offerings and online offers to educate himself as to the offerings, sales, discounts, and promotions being offered, and with the intent of making a purchase through Defendant's Website or at Defendant's Principal Place of Business.

28. While notice to Defendant is not required, MACON sent a pre-suit communication on July 10, 2026. As such, Defendant was on notice and yet still has failed to correct the barriers to access on Defendant's Website.

29. Prior to initiating suit, but following the sending of the pre-suit communications, MACON has continued to attempt to utilize Defendant's Website during MACON's Website Visits to browse and educate himself as to the offerings, sales, discounts, and online promotions, with the intent of making a purchase through Defendant's Website or at Defendant's Principal Place of Business.

30. However, Defendant's Website continues to contain access barriers that prevent free and full use by visually disabled individuals using keyboards and available screen reader software.

## VIOLATIONS OF THE AMERICANS WITH DISABILITIES ACT

31. MACON adopts and re-alleges the allegations stated in paragraphs 1 through 30 above as if fully stated herein.

32. On July 26, 1990, Congress enacted the Americans With Disabilities Act ("ADA"), 42 U.S.C. § 12101 et. seq. Commercial enterprises were provided

one and a half (1.5) years from the enactment of the statute to implement its requirements. The effective date of Title III of the ADA was January 26, 1992, or January 26, 1993, if Defendant(s) have ten (10) or fewer employees and gross receipts of $500,000.00 or less. *See* 42 U.S.C. § 12182; 28 C.F.R. § 36.508(a).

33. Congress found, among other things, that:

a. some 43,000,000 Americans have one or more physical or mental disabilities, and this number shall increase as the population continues to grow older;

b. historically, society has tended to isolate and segregate individuals with disabilities and, despite some improvements, such forms of discrimination against disabled individuals continue to be a pervasive social problem, requiring serious attention;

c. discrimination against disabled individuals persists in such critical areas as employment, housing, public accommodations, transportation, communication, recreation, institutionalization, health services, voting and access to public services and public facilities;

d. individuals with disabilities continually suffer forms of discrimination, including outright intentional exclusion, the

discriminatory effects of architectural, transportation, and communication barriers, failure to make modifications to existing facilities and practices. Exclusionary qualification standards and criteria, segregation, and regulation to lesser services, programs, benefits, or other opportunities; and,

e. the continuing existence of unfair and unnecessary discrimination and prejudice denies people with disabilities the opportunity to compete on an equal basis and to pursue those opportunities for which our country is justifiably famous, and accosts the United States billions of dollars in unnecessary expenses resulting from dependency and non-productivity.

42 U.S.C. § 12101(a)(1)-(3),(5) and (9).

34. Congress explicitly stated that the purpose of the ADA was to:

a. provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities;

b. provide clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities; and

c. invoke the sweep of congressional authority, including the power to enforce the Fourteenth Amendment and to regulate commerce, in order to address the major areas of discrimination faced on a daily basis by people with disabilities.

U.S.C. § 12101(b)(1)(2) and (4).

35. Section 302(a) of Title III of the ADA, 42 U.S.C. § 12101 et seq., provides: "No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation." 42 U.S.C. § 12182(a).

36. "Congress passed the ADA in 1990 to fix a serious problem—namely, the seclusion of people with disabilities resulting in explicit and implicit discrimination. . . . The disabled population hoped that, as a result of the ADA, their lives would no longer be shaped by limited access and the inability to choose.

. . . However, reality—a lack of compliance with the ADA and severe underenforcement of the statute—soon destroyed this hope."[1]

37. More than thirty years "after the passage of the ADA, numerous facilities are still not compliant, leaving the disabled population in a second-class citizenship limbo. Title III of the ADA allows both the U.S. Attorney General[2] and private individuals[3] to sue, but the rate at which [ ] the Attorney General [is] bringing suit seeking compliance is extremely low. The Department of Justice's Disability Section, tasked with ADA enforcement, is understaffed[.]"[4]

38. Thus, "private suits by necessity represent the main tool for ensuring compliance with Congress' intent in passing the ADA,"[5] most of which suits "are brought by a small number of private plaintiffs who view themselves as champions of the disabled."[6]

39. The U.S. Department of Justice ("DOJ") supports this dynamic, recognizing that because it "cannot investigate every place of public

---

[1] Kelly Johnson, *Testers Standing up for the Title III of the ADA*, 59 Cas. W. Res. L. Rev. 683, 684 (2009), http://scholarlycommons.law.case.edu/caselrev/vol59/iss3/6 (citing H.R. REP. No. 101-485, pt. 2, at 28-29 (1990); Elizabeth Keadle Markey, *The ADA's Last Stand?: Standing and the Americans with Disabilities Act*, 71 Fordham L. Rev. 185 (2002) (arguing for a more lenient standard for standing under the ADA); and Samuel R. Bagenstos, *The Perversity of Limited Civil Rights Remedies: The Case of "Abusive" ADA Litigation*, 54 UCLA L. Rev. 1, 3 (2006) (discussing the need for private enforcement in Title III)).
[2] 42 U.S.C. § 12188(b).
[3] 42 U.S.C. § 12188(a).
[4] Johnson, *supra* note 8.
[5] *Betancourt v. Ingram Park Mall*, 735 F. Supp. 2d 587, 596 (W.D. Tex. 2010).
[6] *Id.* (*quoting Molski v. Evergreen Dynasty Corp.*, 500 F.3d 1047, 1062 (9th Cir. 2007)); *D'Lil v. Best Western Encina Lodge & Suites*, 538 F.3d 1031, 1040 (9th Cir. 2008).

accommodation," "[p]rivate plaintiffs play an important role in enforcing the ADA[.]"[7]

40. Consistent with these policies, MACON files this case to ensure Defendant provides full and equal access to the goods and services that Defendant offers to the public from Defendant's Principal Place of Business and/or physical facilities.

41. Defendant's Principal Place of Business and Defendant's Website are public accommodations within the definition of Title III of the ADA, 42 U.S.C. § 12181(7).

42. There is a physical nexus between Defendant's Website and Defendant's Principal Place of Business in that Defendant's Website provides operating hours and access to menu offerings and food and beverage products available at Defendant's Principal Place of Business. Defendant's Website acts as the digital extension of Defendant's Principal Place of Business. The opportunity to shop and pre-shop Defendant's menu offerings available at Defendant's physical location, review food and beverage products and prices, and obtain operating hours through Defendant's Website from home are important accommodations for Plaintiff because traveling outside of his home as a visually disabled individual is

[7] Statement of Interest of the United States of America, *ERC v. Abercrombie & Fitch Co.*, No. 1:09-cv-03157 (D. Md.), ECF No. 38, at *1 (July 6, 2010); *See also Hensley v. Eckerhart*, 461 U.S. 424, 445 (1983) ("All of these civil rights laws depend heavily upon private enforcement, and fee awards have proved an essential remedy if private citizens are to have a meaningful opportunity to vindicate the important Congressional policies which these laws contain.").

often a difficult, hazardous, frightening, frustrating, and confusing experience. Defendant has not provided its business information in any other digital format that is accessible for use by blind and visually impaired individuals using screen reader software.

43. Public accommodations under the ADA must ensure that their places of public accommodation provide effective communication for all members of the general public, including individuals with visual disabilities such as Plaintiff.

44. The broad mandate of the ADA is to provide equal opportunity for individuals with disabilities to participate in and benefit from all aspects of American civic and economic life. That mandate extends to internet e-commerce websites such as the Defendant's Website.

45. Under Section 302(b)(1) of Title III of the ADA, it is unlawful discrimination to deny individuals with disabilities the opportunity to participate in or benefit from the goods, services, facilities, privileges, advantages or accommodations of an entity. 42 U.S.C. § 12182(b)(1)(A)(i).

46. Under Section 302(b)(1) of Title III of the ADA, it is unlawful discrimination to deny individuals with disabilities an opportunity to participate in or benefit from the goods, services, facilities, privileges, advantages or accommodations, which is equal to the opportunities afforded to other individuals. 42 U.S.C. §12182(b)(1)(A)(ii).

47. Under Section 302(b)(2) of Title III of the ADA, unlawful discrimination also includes, among other things: “a failure to make reasonable modifications in policies, practices or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages or accommodations; and a failure to take such steps as may be necessary to ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals because of the absence of auxiliary aids and services, unless the entity can demonstrate that taking such steps would fundamentally alter the nature of the good, service, facility, privilege, advantage or accommodation being offered or would result in an undue burden.” 42 U.S.C. § 12182(b)(2)(A)(ii)-(iii); see also 28 C.F.R. § 36.303(a).

48. According to 28 C.F.R. §36.303(b)(1), auxiliary aids and services include “voice, text, and video-based telecommunications products and systems”. Indeed, 28 C.F.R. §36.303(b)(2) specifically states that screen reader software is an effective method of making visually delivered material available to individuals who are blind or have low vision.

49. Title III requires that "[a] public accommodation shall furnish appropriate auxiliary aids and services where necessary to ensure effective communication with individuals with disabilities." 28 C.F.R. § 36.303(c)(1). The regulation sets forth numerous examples of "auxiliary aids and services," including "...accessible electronic and information technology; or other effective methods of making visually delivered materials available to individuals who are blind or have low vision." 28 C.F.R. § 36.303(b). The acts alleged herein constitute violations of Title III of the ADA, and the regulations promulgated thereunder. MACON, who is blind and has disabilities that substantially limit the major life activity of seeing within the meaning of 42 U.S.C. §§ 12102(1)(A) and (2)(A), and has been denied full and equal access to Defendant's Website because of his disability. He has not been provided services that are provided to other patrons who are not disabled, and/or has been provided services that are inferior to the services provided to non-disabled persons. Defendant has failed to take the required prompt and equitable steps to remedy its discriminatory conduct. These violations are ongoing.

50. MACON encountered barriers on each of MACON's Website Visits. MACON attempted to access and/or utilize Defendant's Website, but was unable to, and he continues to be unable to enjoy full and equal access to Defendant's Website and/or understand the content therein because numerous portions of Defendant's Website do not interface with MACON's screen reader software.

Specifically, features of Defendant's Website are inaccessible to MACON's screen reader software, including, but not limited to, the following (citing the WCAG 2.1 Level A and AA Guidelines and Conformance Levels):

a. **Tsukiyomi Sushi Bar & Grill Logo Does Not Have Alternative Text**

i. **Issue:** The Tsukiyomi Sushi Bar & Grill logo image lacks defined alternative text, preventing screen reader users from identifying the logo or understanding the brand information it conveys. If the logo functions as a link, users are unable to determine the purpose or destination of that link, creating a significant barrier for individuals who rely on assistive technologies to access essential branding and navigation information.




ii. **WCAG 2.1 AA Violations:** 1.1.1 - A - Non Text Content

iii. **Impact:** Blind users and those who rely on screen readers are entirely unable to identify the Tsukiyomi Sushi Bar & Grill logo, as no alternative text has been provided to convey its meaning or function. When the logo also serves as a navigational link, these users cannot determine where the link leads, leaving them without access to critical branding context and navigation options that sighted users receive instantly. The absence of meaningful alternative text effectively excludes individuals with visual disabilities from a fundamental aspect of the page experience, denying them equal access to information that is immediately available to non-disabled users.

**b. Decorative Images Are Incorrectly Defined as Home Links**

i. **Issue:** Decorative images on the page are incorrectly implemented as links to the home page, despite conveying no meaningful information or functionality. Screen reader users encounter unnecessary and purposeless links while navigating the page, and keyboard users are required to tab through additional focusable elements that serve no functional role. This creates a significant barrier for users

who rely on assistive technologies, as they must navigate through irrelevant interactive elements in order to reach meaningful content.




ii. **WCAG 2.1 AA Violations:** 1.1.1 - A - Non Text Content

iii. **Impact:** Blind users and those navigating by keyboard or screen reader are burdened with encountering superfluous, non-functional links embedded within decorative images that provide no informational or navigational value. Each unnecessary focusable element interrupts the user's ability to navigate efficiently, forcing individuals with visual disabilities to expend additional effort parsing and bypassing irrelevant interactive content. This erodes the overall usability of the page for blind users, who depend on a clean and logical interactive structure to navigate effectively, and places them at a distinct disadvantage

compared to sighted users who can visually disregard purely decorative elements.

**c. Required Field Indicator Instruction Is Not Defined on the Page**

i. **Issue:** The page uses an asterisk ("*") to visually indicate required form fields; however, no instruction is provided to explain the meaning of this symbol. Screen reader users may be unaware that fields marked with an asterisk are mandatory prior to submitting the form, as the required field information is neither communicated programmatically nor conveyed through accessible instructions. This creates a significant barrier for users who rely on assistive technologies, who may consequently miss critical information necessary to complete the form successfully.



ii. **WCAG 2.1 AA Violations:** 3.3.2 - A - Labels Or Instructions

iii. **Impact:** Blind users and those relying on screen readers are unable to determine which form fields are required before attempting submission, as the asterisk symbol used to denote mandatory fields is not accompanied by any accessible explanation or programmatic identification. Without this essential guidance, individuals with visual disabilities risk submitting incomplete forms, receiving unexpected error messages, and experiencing repeated failed attempts that sighted users can easily avoid by reading the visual indicator. This disparity places blind users at a measurable disadvantage in completing a basic interactive task, undermining their ability to independently and successfully engage with the form.

**d. Multiple Level 1 Headings Are Defined on the Page**

i. **Issue:** The page contains multiple Level 1 (``) headings, resulting in an incorrect and confusing heading structure. A well-structured page should have a single, clearly defined

main heading that identifies its primary topic or purpose. Screen reader users who navigate by headings may encounter several competing main headings and are consequently unable to determine the intended organization of the content, creating a significant barrier for individuals who rely on heading navigation to efficiently understand and move through the page.




ii. **WCAG 2.1 AA Violations:** 1.3.1 - A - Info And Relationships

iii. **Impact:** Blind users and those who navigate web content using screen reader heading commands are directly hindered by the presence of multiple Level 1 headings, as this irregular structure obscures the page's organizational hierarchy and makes it difficult to identify the primary

purpose of the content. Where sighted users can rely on visual design cues such as size, weight, and placement to infer content relationships, blind users depend entirely on a logical and consistent heading structure to build an accurate mental model of the page. The presence of multiple `` elements disrupts this process, causing confusion and inefficiency that disproportionately affects individuals with visual disabilities.

**e. "HOUR" Text Is Not Defined as a Heading**

i. **Issue:** The "HOUR" text is visually presented as a section title but is not programmatically defined as a heading element on the page. Screen reader users who navigate using heading commands are unable to identify or move directly to the hours section, as the visual prominence of this text is not reflected in the underlying page structure. This creates a significant barrier for users who rely on heading navigation to understand the organization of page content, as the structural information conveyed visually to sighted users is not made available through assistive technologies.




ii. **WCAG 2.1 AA Violations:** 1.3.1 - A - Info And Relationships

iii. **Impact:** Blind users and those who navigate by headings using a screen reader are unable to locate or jump directly to the hours section of the page, as the "HOUR" text lacks the programmatic heading designation necessary for it to be recognized by assistive technologies. While sighted users can immediately identify this text as a distinct section title based on its visual styling, blind users receive no equivalent structural signal, preventing them from efficiently scanning and navigating the page. This gap between visual presentation and programmatic structure places individuals with visual disabilities at a significant disadvantage, denying them the same ease of access to page content that sighted users experience.

### f. Main Content Area Is Not Defined Programmatically

i. **Issue:** The main content area of the page lacks programmatic definition through an appropriate landmark element, preventing screen reader users from efficiently identifying and navigating directly to the primary content via landmark navigation. Users who rely on assistive technologies are compelled to traverse repeated content, such as headers and navigation menus, before reaching the primary information, creating a significant barrier to efficient comprehension and navigation of the page structure.




ii. **WCAG 2.1 AA Violations:** 2.4.1 - A - Bypass Blocks

iii. **Impact:** For users who are blind or have visual disabilities and rely on screen readers, the absence of a

programmatically defined main content landmark renders efficient page navigation effectively impossible. Without a designated main landmark such as the semantic `` element or an equivalent `role="main"` attribute, these users are forced to listen through all repeated header and navigation content on every page load before reaching the primary information. The page should contain a single main landmark accurately representing the primary content area, enabling screen reader users to bypass repeated elements and navigate directly to the main content region.

**g. Food Menu Is Defined Using an Image of Text**

i. **Issue:** The food menu is presented as an image containing text rather than as actual programmatic text content, rendering the menu inaccessible to screen reader users. Because the text within the image is not available as machine-readable content, users who rely on assistive technologies are unable to access food items, descriptions, or pricing information displayed within the image, creating a significant barrier whereby the same information available to sighted users is entirely unavailable to non-sighted users.




ii. **WCAG 2.1 AA Violations:** 1.1.1 - A, 1.4.5 - AA - Non Text Content

iii. **Impact:** For users who are blind or have visual disabilities, a food menu presented solely as an image of text is completely inaccessible. Screen readers cannot interpret or announce the textual content embedded within an image, meaning that blind users are entirely unable to independently review menu items, read descriptions, or determine pricing. This constitutes a critical exclusion from a fundamental aspect of the service. The food menu must be provided using actual HTML text so that all content, including menu items, descriptions, and prices, is selectable, readable, and fully accessible to assistive technologies. Where an image version of the menu is also

provided, a comprehensive text alternative containing all equivalent information must be made available.

h. **Focus Does Not Move to Menu Section After Activating the "Menu" Link**

i. **Issue:** Upon activation of the "Menu" link, the page scrolls visually to the Menu section; however, both keyboard focus and screen reader focus remain anchored to the original link location. Although the visual position of the page changes, the programmatic focus does not move to the destination section, creating a significant barrier whereby screen reader users may be unaware that the page has scrolled or may inadvertently continue reading content from their previous location rather than from the newly displayed section.




ii. **WCAG 2.1 AA Violations:** 2.4.3 - A - Focus Order

iii. **Impact:** For users who are blind and navigate exclusively via keyboard and screen reader, the failure to move programmatic focus upon activation of an in-page navigation link creates a deeply disorienting experience. When the visual page position changes but focus remains at the original location, blind users receive no indication that the page has scrolled and may continue reading from the wrong section, entirely missing the Menu content. Upon activation of the "Menu" link, keyboard focus must be programmatically moved to the beginning of the Menu section or an appropriate heading within it, so that screen reader users are immediately informed of their new location and can continue navigating forward from that point in alignment with the visual movement of the page.

51. Defendant's Website was subsequently visited by Plaintiff's expert, Till Paris, on or about July 4, 2026, and who confirmed the access barriers that MACON had initially encountered did, in fact, exist. The numerous access barriers found on Defendant's Website by Plaintiff's Expert are set forth in the Declaration of Till Paris, attached hereto as "Composite Exhibit 1". The contents of "Composite Exhibit 1" are incorporated herein by reference. These access barriers

continue to render Defendant's Website inaccessible to users who are blind and visually disabled, including MACON.

52. More violations may be present on Defendant's Website, which can and will be determined and proven through the discovery process in this case.

53. There are readily available, well-established guidelines on the internet for making websites accessible to the blind and visually disabled. These guidelines have been followed by other large business entities in making their websites accessible. Incorporating such basic components to make the Defendant 's Website accessible would neither fundamentally alter the nature of Defendant's business nor would it result in an undue burden to the Defendant.

54. Defendant thus has failed to make reasonable modifications in its policies, practices, or procedures when such modifications are necessary to afford goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, in violation of 28 C.F.R. §36.302.

55. To the best of Plaintiff's belief and knowledge, Defendant has failed to eliminate the specific violations set forth in paragraph 50 and 51 herein. As a result, Defendant has violated the ADA -- and continues to violate the ADA -- by denying access to Defendant's Website by individuals, such as MACON, with visual disabilities who require the assistance of interface with screen reader

software to comprehend and access internet websites. These violations within the Defendant's Website are ongoing.

56. Although Defendant is charged with having knowledge of the violations, Defendant may not have actual knowledge of said violations until this Complaint makes Defendant aware of same.

57. Here, however, MACON, through counsel, did send a pre-suit communication informing Defendant of the barriers to access on July 10, 2026. As such, Defendant was on notice and yet still has failed to correct the barriers to access on Defendant's Website.

58. As a direct and proximate result of Defendant's failure to provide an ADA compliant Website, with a nexus to its Defendant's Principal Place of Business, Plaintiff has suffered an injury in fact by being denied full access to and enjoyment of Defendant's Website and Defendant's Principal Place of Business.

59. Because of the inadequate development and administration of the Defendant's Website, MACON is entitled to injunctive relief pursuant to 42 U.S.C. §12133 and 28 C.F.R. §36.303, to remedy the ongoing disability discrimination.

60. Enforcement of MACON's rights under the ADA is right and just pursuant to 28 U.S.C. §§2201 and 2202.

61. MACON has retained the undersigned counsel for the pursuit, filing and prosecution of this action. MACON is entitled to have his reasonable

attorneys' fees, costs and expenses paid by Defendant, pursuant to 42 U.S.C. § 12205 and 28 CFR § 36.505.

62. Pursuant to 42 U.S.C. §12188, this Court is vested with the authority to grant MACON appropriate and necessary injunctive relief; including an order to:

a. Require Defendant to adopt and implement a web accessibility policy to make publicly available and directly link from the homepage of Defendant's Website to a statement as to the Defendant's policy to ensure persons with disabilities have full and equal enjoyment of the services, facilities, privileges, advantages, and accommodations through Defendant's Website.

b. Require Defendant to take the necessary steps to make Defendant's Website readily accessible to and usable by visually disabled users, and during that time period prior to Defendant's Website's being readily accessible, to provide an alternative method for individuals with visual disabilities to access the information available on Defendant's Website until such time that the requisite modifications are made, and

c. Require Defendant to provide the appropriate auxiliary aids such that individuals with visual impairments will be able to

effectively communicate with Defendant's Website for purposes of viewing and locating Defendant's Principal Place of Business, and becoming informed of and purchasing Defendant's offerings online, and during that time period prior to Defendant's Website's being designed to permit individuals with visual disabilities to effectively communicate, to provide an alternative method for individuals with visual disabilities to effectively communicate for such goods and services made available to the general public through Defendant's Website.

WHEREFORE, MACON requests entry of judgment in his favor and against Defendant for the following relief:

A. A declaration that Defendant's Website is in violation of the ADA;

B. An Order requiring Defendant, by a date certain, to update Defendant's Website, and continue to monitor and update Defendant's Website on an ongoing basis, to remove barriers in order that individuals with visual disabilities can access, and continue to access, Defendant's Website and effectively communicate with Defendant's Website to the full extent required by Title III of the ADA;

C. An Order requiring Defendant, by a date certain, to clearly display the universal disabled logo within Defendant's Website, wherein the logo

would lead to a page which would state Defendant's accessibility information, facts, policies, and accommodations. Such a clear display of the disabled logo is to ensure that individuals who are disabled are aware of the availability of the accessible features of Defendant's Website;

D. An Order requiring Defendant, by a date certain, to provide ongoing support for web accessibility by implementing a website accessibility coordinator, a website application accessibility policy, and providing for website accessibility feedback to ensure compliance thereto;

E. An Order directing Defendant, by a date certain, to evaluate its policies, practices and procedures toward persons with disabilities, for such reasonable time to allow Defendant to undertake and complete corrective procedures to Defendant's Website;

F. An Order directing Defendant, by a date certain, to establish a policy of web accessibility and accessibility features for Defendant's Website to ensure effective communication for individuals who are visually disabled;

G. An Order requiring, by a date certain, that any third-party vendors who participate on Defendant's Website to be fully accessible to the visually disabled;

H. An Order directing Defendant, by a date certain and at least once yearly thereafter, to provide mandatory web accessibility training to all employees who write or develop programs or code for, or who publish final content to, Defendant's Website on how to conform all web content and services with ADA accessibility requirements and applicable accessibility guidelines;

I. An Order directing Defendant, by a date certain and at least once every three months thereafter, to conduct automated accessibility tests of Defendant's Website to identify any instances where Defendant's Website is no longer in conformance with the accessibility requirements of the ADA and any applicable accessibility guidelines, and further directing Defendant to send a copy of the twelve (12) quarterly reports to Plaintiff's counsel for review;

J. An Order directing Defendant, by a date certain, to make publicly available and directly link from Defendant's Website's homepage, a statement of Defendant's Accessibility Policy to ensure the persons with disabilities have full and equal enjoyment of Defendant's Website and shall accompany the public policy statement with an accessible means of submitting accessibility questions and problems;

K. An award to Plaintiff of his reasonable attorney's fees, costs, and expenses; and

L. Such other and further relief as the Court deems just and equitable.

Dated: October 2, 2026 Respectfully submitted,

**ADA LEGAL TEAM, LLC**
300 Avenue of the Champions, Suite 260
Palm Beach Gardens, FL 33418
Phone: (561) 227-9821
Facsimile: (561) 491-9459

By: **/s/ Gregory S. Sconzo**
GREGORY S. SCONZO, ESQUIRE
Florida Bar No.: 0105553
**DESIGNATED LEAD COUNSEL**
**Primary Email:** greg@sconzolawoffice.com
**Secondary Email**: greg@adalegalteam.com
**Secondary Email**: kevin@adalegalteam.com
**Attorney for Plaintiff**